**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**BEATRICE B. MCWATERS, ET AL.**                             **CIVIL ACTION**

**VERSUS**                                                                    **NO. 05-5488**

**FEDERAL EMERGENCY MANAGEMENT**                 **SECTION "K" (3)**
**AGENCY, ET AL.**

<u>**ORDER AND REASONS**</u>

Before the Court is Plaintiffs' Motion for Temporary Restraining Order and Preliminary

Injunction (Rec. Doc. No. 22) and November 28, 2005 Motion for Temporary Restraining Order

and Preliminary Injunction (Rec. Doc. No. 26).   After review of the pleadings and memoranda,

as well as having held a hearing on the Motion on December 9, 2005, the Court **GRANTS** in

part and **DENIES** in part both Motions.[1]

**Facts and Procedural History**

On August 29, 2005 at around 6:10 a.m. Hurricane Katrina devastated the Gulf Coast of

the United States.   Striking in the early morning, Hurricane Katrina initially made landfall in

---

[1]Although Plaintiffs' Motions request both a TRO and preliminary injunction, the Court
limited the hearing on December 9, 2005 to only the Temporary Restraining Order Motions.
Pursuant to Rule 65 of the Federal Rules of Civil Procedure, both preliminary injunction Motions
are consolidated and will be heard in conjunction with the Permanent Injunction Hearing scheduled
for February 23-24, 2006.  *See* Fed.R.Civ.P. 65.

southeastern Louisiana before moving across Mississippi and Alabama, leaving a swath of destruction in excess of 250 miles.  As a result of the storm, there were three significant separate levee breaches in New Orleans and the surrounding area, submerging up to 80% of the greater metropolitan in water as deep as twenty feet.  This water did not recede completely for several weeks thereafter, and a majority of the homes and structures in Orleans Parish and the parishes surrounding it were destroyed or washed away.  Mississippi fared no better, with approximately 90% of the buildings along Mississippi's Gulf Coast being wiped out by a storm surge believed to be as high as thirty feet.  By 11:00a.m. Katrina's eastern side had passed over Mobile, Alabama, submerging large sections of that city under water as well.

As a result of the storm and the ensuing floods, many people, especially those in the city of New Orleans, were required to evacuate their homes, some literally swimming to safety. Most of those who, for a variety of reasons (mainly a lack of resources) failed to evacuate prior to the storm were either rescued or removed via a combination of local, state, and government enforcement officials dispatched from all of the country, including the National Guard.  Most of these rescued citizens were placed on buses or airplanes out of New Orleans and bound for shelters, hotels, and motels in various parts of the country, with most not knowing their final destinations.  Parts of the city remained flooded for weeks, and citizens were forbidden from returning by local and state officials working in connection with the federal government.  Over 1,200 Americans died, with over 1,000 of these deaths in Louisiana alone, many from drowning. For those who did get out, the vast majority of their homes were destroyed or rendered

uninhabitable or inaccessible as a direct result of the storm, and in some cases residential areas remained closed to homeowners for over three months. [2]

Notably, more than 90,000 people in the affected areas had incomes of less than $10,000 per year.  In Orleans Parish alone more than 40% of children affected by Katrina lived in households with incomes below the federal poverty line.  According to the Center on Budget and Policy Priorities, of the 5.8 million individuals who lived in those states struck hardest by Katrina, over one million lived in poverty prior to the storm.[3]  In New Orleans, 28% of the city's residents were living in poverty prior to Katrina, and those who were poor commonly lacked their own means of transport.[4] For instance, 65% of poor elderly households in New Orleans did not have a vehicle, "making it more difficult for them to escape the storm and its effects."[5] About one of every three people who lived in areas hit hardest by Katrina were African-American; in contrast, one of every eight people in the nation is African-American.[6]  More than one in three

---

[2]*See* City of New Orleans Press Release entitled "City Opens 9th Ward for 'Look and Leave'"(" The entire Lower 9th Ward will be open to residents for "look and leave" visitation beginning Thursday, December 1, 2005.), *available at* http://www.cityofno.com/portal.aspx?portal=1&load=~/PortalModules/ViewPressRelease.ascx&itemid=3303.

[3]*See* Sherman, Arloc and Isaac Shapiro,"Essential Facts about the Victims of Hurricane Katrina"("Mississippi, Louisiana, and Alabama are, respectively, the first, second and eighth poorest states in the nation . . . [this] information . . . helps explain why relief efforts are so important . . . Many of the storm's victims have little or no resources on which to rely in these difficult times.")(September 19, 2005), *available at* http://www.cbpp.org/9-19-05pov.htm.

[4]*Id.*("Those who were poor in New Orleans commonly lacked their own means of transportation.  Our calculations . . . show that more than half of the poor households in New Orleans–54 percent–did not have a car, truck, or van in 2000.  Among the elderly, the proportion was higher).

[5]*Id.*

[6]*Id.* (African Americans made up a disproportionate share of the hurricane's victims  . . . [and] African Americans living in New Orleans were especially likely to be without a vehicle

black households in New Orleans (35%), and nearly three in five poor black households (59%) lacked a vehicle.[7]

As a result of the destruction, evacuees were dispersed to forty-five states, with more than 250,000 people ending up in shelters, most with nothing left.  Others were placed by the Red Cross into its "Direct Payment Hotel/Motel Program."  This program allowed evacuees with few resources to stay in hotels and motels paid for by the Red Cross until such time as evacuees were able to find more permanent housing.  On October 24, 2005 the Federal Emergency Management Agency ("FEMA") took over the hotel/motel program and it became known as the "Short-Term Lodging Program."  FEMA is the federal agency responsible for providing disaster victims with temporary housing assistance, either in the form of financial assistance to pay for rental housing, or a trailer or mobile home.  FEMA's obligations arise pursuant to the Disaster Relief and Emergency Assistance Act and the regulations promulgated thereunder via the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. §5121 *et seq*.

Notably, the Short-Term Lodging Program is separate from the other types of assistance, including Temporary Housing Assistance as offered by FEMA under its governing statute. Participation in the Short-Term Lodging Program (referred to as a §403 program under the

---

before the hurricane struck.").

[7]*See* Sherman, Arloc and Isaac Shapiro,"Essential Facts about the Victims of Hurricane Katrina"("Mississippi, Louisiana, and Alabama are, respectively, the first, second and eighth poorest states in the nation . . . [this] information . . . helps explain why relief efforts are so important . . . Many of the storm's victims have little or no resources on which to rely in these difficult times.")(September 19, 2005), *available at* http://www.cbpp.org/9-19-05pov.htm.

Stafford Act) does not count against the $26,200 in Temporary Housing Assistance (§408), also provided to eligible individuals under the Act.

On November 15, 2005 FEMA announced that as of the close of business on November 30, 2005, it would cease funding the Short-Term Lodging Program by November 30, 2005. Subsequently this deadline was extended by FEMA directive to December 15, 2005, or January 7, 2006, with extensions being granted on a state-by state basis and depending upon the number of evacuees in hotels or motels in each state.  Only those ten states that were currently housing the greatest number of evacuees were eligible to apply for the January 7, 2005 extension.  As of December 9, 2005, FEMA again modified this date with a letter stating that those individuals staying in hotels in any State that have yet to receive a decision on their application for individual assistance by December 9, 2005 or have been approved but not yet received that assistance would have their current hotel subsidy extended to January 7, 2006.  FEMA also informed the Court that the states of Louisiana, Mississippi, and Texas have applied for and been granted the January 7, 2005 state extension.

Plaintiffs commenced this putative class action on November 10, 2005 by filing a Class Action Complaint (Rec. Doc. No.1) on behalf of thirteen named plaintiffs, all of whose homes were destroyed due to Katrina and all of whom have applied for and, as of the date of filing, had failed to receive, any disaster assistance ("Assistance") from FEMA.  Plaintiffs' subsequently amended their Complaint (See Rec. Doc. Nos. 21 and 29).  The putative class consists of all persons who (a) on August 29, 2005, resided in Louisiana, Mississippi, or Alabama, in areas declared to be Federal Disaster Areas; (b) were displaced from their pre-disaster primary residences or whose pre-disaster primary residences have been rendered uninhabitable as a result

5

of Hurricane Katrina; and (c) have applied for or will apply for assistance under the Stafford Act, and (i) have not yet received Assistance, (ii) have unlawfully been denied Assistance, (iii) have not been adequately informed about the scope and conditions of the available Assistance, and/or (iv) have been unable to apply for Assistance due to a lack of information or accessibility to FEMA.[8]  Plaintiffs allege, *inter alia,* seventeen causes of action, including statutory and constitutionally based claims, all stemming from FEMA's response (or lack thereof) in the aftermath of Hurricane Katrina.  Plaintiffs seek only declaratory and injunctive relief, including a Temporary Restraining Order mandating that defendants abide by the requirements of the Stafford Act and the Due Process Clause of the Fifth Amendment and provide Assistance to eligible applicants.  Plaintiffs also request an injunction against FEMA's imminent termination of the Short-Term Lodging Program on the grounds that such a termination violates the Due Process Clause and that pursuant to the Stafford Act and the Administrative Procedure Act ("APA"), FEMA's failure to provide and unreasonable delay of Housing Assistance is unlawful. *See* 5 U.S.C. §553, §706(1), §706(2)(A), §706(2)(C); 42 U.S.C. §5165c.  Plaintiffs aver that they are eligible for Assistance under the Stafford Act because they are persons who are "displaced from their pre-disaster primary residences or whose pre-disaster primary residences are rendered uninhabitable as a result of damage caused by a major disaster." 42 U.S.C. §5174(b).  Besides challenging FEMA's authority to unilaterally terminate the Short-Term Lodging Program, the Complaint itself alleges several violations of the Stafford Act made by FEMA in conjunction with its Katrina relief efforts.  Plaintiffs challenge the so-called "Shared Household Rule"

---

[8]The class deals only with eligible persons and thus does not include persons who have committed fraud in applying for Assistance.

whereby many disaster victims have been denied Assistance from FEMA on the basis that they lived or shared the same address or phone number of another applicant.[9]  Plaintiffs allege others were denied Assistance on the basis that they were told to apply for Small Business Administration (SBA) Loan and that failure to do so would prevent them from receiving any Temporary Housing Assistance, a clear violation §5174(a)(2) of the Stafford Act.  Plaintiffs also argue that many who did receive the preliminary payment of $2358 under the Temporary Housing Provisions of the Stafford Act were either given no notice that such monies were to be spent solely on rent and that failure to do so would prevent the applicant from receiving further Assistance from FEMA, or that such notice came to late, and as a result, plaintiffs spent the money on other necessary items, like food and clothing.[10]  Finally, plaintiffs also allege that many of them have been waiting in excess of three months now for an adjudication of their claim for Assistance.  Over 80,000 applications for Assistance are still listed as "pending" over three months since Katrina hit; plaintiffs argue such a delay is an unlawful violation of both the Stafford Act and the Due Process Clause.

At the Court's request during the Hearing on the TRO Motions held on December 9, 2005, plaintiffs gave a summation of the precise relief they are seeking pursuant to the two TRO

---

[9]Prior to Oral Argument on December 9, 2005, FEMA issued a directive dated September 19, 2005 which stated that it would no longer be enforcing the Shared Household Rule for members of the same economic household that for reasons due to the storm, were now living in separate geographical locations.

[10]Prior to Oral Argument on December 9, 2005, FEMA issued a directive dated November 21, 2005 which stated that it would waive the $2358 rental restriction requirement provided that those applicants who need further rental assistance sign an attached declaration stating they did not receive the notice restricting the uses of this payment and as a result, the $2358 was spent on other essential items besides rent.  Upon execution and return the declaration those Applicants would then be re-certified for continuing Assistance.

Motions currently before the court.  Specifically, as to the Short-Term Lodging Program, plaintiffs ask that this Court order relief such that no eligible applicant who has applied for benefits whose application has yet to be processed (that is has yet to either be denied or receive any temporary housing assistance payment, and thus is listed as "pending") be evicted[11] from their hotel or motel  until fifteen (15) days after that disposition but in no case earlier than February 7, 2006.

Regarding the Shared Household Rule, plaintiffs ask defendants be ordered to notify all applicants whose cases are "pending" or have been denied based upon (a) the Shared Household Rule or (b) duplicate information on their application with that of another applicant, that they are eligible to establish a separate household in a different geographic location after the disaster. Plaintiffs request this notice be provided by the use of, at a minimum, public service announcements, television, radio, and newspaper ads.

Similarly, with regards to the SBA Loan application requirement issue, plaintiffs request an injunction and order requiring defendants to notify, in same manner as above, those evacuees whose applications are "pending" due to a faulty or unnecessary SBA loan application, or who may not have pursued assistance because they believed or were told that an applicant must apply for a SBA loan in order to obtain temporary housing assistance, and that no such requirement exists and the applicant is eligible for Assistance.

---

[11]The Court notes that during Oral Argument on December 9, 2005 the Government objected to any use of the word "evicted" in regards to any characterization of FEMA's relationship to those evacuees staying in hotels or motels.  *See* Transcript, Dec. 9, 2005 p. 162 (wherein counsel for the Government stated "the word evicted isn't an appropriate word here.  The people are in hotels, obviously their 'landlords' are the proprietors of the hotels.  The states, not FEMA but the states are providing funds to the hotel for people to live there and FEMA is providing those funds to the states.  It's not FEMA, FEMA would not be evicting anyone, even if that Section 403 assistance –were terminated.").

As to those who received the initial $2358 rental payment in Temporary Housing Assistance but, due to a lack of notice as to its restrictions, spent it on necessary sundries instead of rent, plaintiffs also request greater dissemination of FEMA's waiver of this restriction through methods similar to those described above so that if an applicant used the money on something other than housing rent they are still eligible for continued Assistance.  Finally, as to those applications still deemed "pending"almost three months after the storm, plaintiffs request the Court order that those applicants be deemed "presumptively eligible" and that the Court set a timetable that FEMA must adhere to in making determinations with regard to all pending applications.  Plaintiffs suggest a timetable such that by January 1, 2006, all applications currently "pending" will have a final decision.

## Legal Standard

The prerequisites for issuance of a temporary restraining order or preliminary injunction are as follows:

(1)     a substantial likelihood that the movant will prevail on the merits;
(2)     a substantial threat that irreparable harm will result if the injunction is not granted;
(3)     the threatened injury outweighs the threatened harm to the defendant; and
(4)     the granting of the preliminary injunction will not disserve the public interest.

*See Clark v. Pritchard*, 812 F.2d 991, 993 (5th Cir. 1987); *see also Wexler v. City of New Orleans*, 267 F.Supp. 2d 559, 564 (E.D. La. 2003)(Duval, J.).  When analyzing the degree of "success on the merits" that a movant must demonstrate to justify injunctive relief, the Fifth Circuit employs a sliding scale involving the balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits.  *See SAS Overseas Consultants v. Benoit*, 2000 WL 140611 at *4 (E.D. La., Feb. 7,

2000)(Vance, J.)(citing *Productos Carnic S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)).  Moreover, when the other factors weigh in favor of an injunction, a showing of *some* likelihood of success on the merits will justify temporary injunctive relief.  *Id.*

     The Court notes that at Argument on December 9, 2005 the Government requested that the Court defer ruling on plaintiffs' Motions for a Temporary Restraining Order for at least two weeks.  These Motions have been pending since November 18, 2005 (Rec. Doc. No. 22) and November 28, 2005, (Rec. Doc. No. 26) respectively.   Each of course, alleges, *inter alia*, *irreparable* injury and *immediate* harm for thousands of persons who have been displaced due to Katrina, and as a result of governmental policies, could be rendered shelterless.  Unfortunately it seems as if inaction has been the *leit motif* of the response to most severe natural disaster in the Nation's history.  While in most cases this inaction has not been motivated by insidious intentions, but rather by the immensity of the problems facing all levels of government, the hurricane did strike more than three months ago.  As such, it is this Court's feeling that the initial paralysis stage has passed and all government agencies–local, state and federal–should be operating in full tilt to assist the hundreds of thousands of citizens displaced by no fault of their own.  Thus, it is incumbent on this Court to immediately act upon these claims.  Certainly the Court would like to have the luxury of having the time to thoroughly study every nuance and permutation of law and fact presented in this complex proceeding; however, this is not the Court's role in ruling upon a Temporary Injunction, especially under the circumstances set forth above.

## Analysis

The Government's primary defense is sovereign immunity.  Essentially it is the Government's position that the acts and/or omissions as alleged by plaintiffs are all discretionary in nature and therefore immune from judicial review.  Moreover, it is also the Government's position that FEMA may commit unconstitutional acts and likewise not be subject to judicial review.  Of course, FEMA adamantly denies any unconstitutional action or any unlawful acts.

The statutory authority for the Government's argument is set forth in §5148 of the Stafford Act which provides, "the Federal Government shall not be liable for any claim based upon the exercise of performance of or the failure to exercise or perform a discretionary function or duty on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions of this chapter."  42 U.S.C. §5148.  The Government cites *inter alia*, *Sunrise Village Mobile Home Park, L.C. v United States*, 42 Fed. Cl. 392, 399 (1998)(citing *Berkovitz v. United States*, 468 U.S. 531, 536-37 (1988)), *City of San Bruno v. FEMA*, 181 F.Supp. 2d 1010, 1014-15 (N.D. Cal. 2001); *see also Ornellas v. United States*, 2 Cl. Ct. 378, 379-80 (1983).

In *Berkovitz*, the Supreme Court examined the discretionary function exception in relation to the duties of a federal agency and its employees in the context of the Federal Tort Claims Act ("FTCA").[12]  The Court held that the discretionary function exception "will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the

---

[12]  Whether the discretionary function exception applies involves a two part analysis:
(1)      whether the act involves an element of judgment or choice; and
(2)      if so, whether that judgment is of the kind the discretionary function exception was designed to shield.  *Berkovitz*, 486 U.S. at 536.

directive." *Berkovitz*, 468 U.S. at 536.  The Court further stated that the discretionary function exception insulates the government from actions which involve the permissible exercise of policy judgment, and it embodies Congress's desire to prevent the second-guessing of administrative decisions. *Id.*  However, if an agency fails to act in accordance with a specific, mandatory directive the discretionary function exception does not apply. *Id.* at 544.

This Court has found only a handful of cases discussing the discretionary function exception under the Stafford Act, and these cases have consistently used the 'discretionary function' exception analysis as set out in *Berkovitz*.  *See United Power Association v. FEMA,* 2000 WL 33339635 *1, *2 (D.N.D. Sept. 13, 2000); *see also Dureiko v. United States,* 209 F.3d 1345 (Fed.Cir.2000); *Graham v. FEMA*, 149 F.3d 997 (9th Cir. 1998); *Rosa v. Brock*, 826 F.2d 1004 (11th Cir. 1987); *Torres v. Government of the United States*, 979 F.Supp. 1054 (D.V.I. 1997); *Lockett v. FEMA*, 836 F.Supp. 847 (S.D.Fla. 1993). Accordingly, so will this Court.

Closely parallel is the waiver of sovereign immunity found in the Administrative Procedure Act, 5 U.S.C. §701 *et seq.*  Section 701 of the APA excludes judicial review of agency action in two situations: (1) where a statute precludes review; and/or (2) where agency action is committed to agency discretion by law.  Although the Government was less than pellucid in its argument regarding the APA, it is the Court's understanding that FEMA is not immune from all judicial review; rather only from review of those acts that are discretionary in nature.   Certainly there has been no authority cited to this Court to demonstrate that Congress intended FEMA to be completely immune from all judicial review.  *See* 42 U.S.C. §5121.

In *Cornell Village Tower Condominium v. Department of Housing and Urban Development*, 750 F.Supp. 909, 915 (N.D.Ill.1990), the court, in discussing the second prong of

§701(a) (the agency discretion exception), commented on its narrow scope, stating, "the

Supreme Court, in its first exploration of this doctrine, announced that §701(a)(2) precluded

review only 'in those rare instances where statutes are drawn in such broad terms that in a given

case there is no law to apply.'" *Id. (citing Citizens to Preserve Overton Park, Inc. v. Volpe,* 401

U.S. 410 (1971); *see also Turner v. United States Parole Commission,* 810 F.2d 612, 614 (7th

Cir. 1987)("judicial review. . . will be presumed unless the statutory scheme provides no

meaningful guideline by which to define the limits of the agency's discretion.")).  The APA

applies here because plaintiffs claim to be adversely affected by agency action and seek specific,

non-monetary relief.  *See* 5 U.S.C. §702.  Therefore the issue before this Court is whether the

acts or omission complained of by the plaintiffs are discretionary in nature or in fact mandated

by law or regulation.  The Court will discuss the five areas of relief requested by plaintiffs at the

hearing seriatim.

        1.     **Shared Household Rule**

        Plaintiffs ask defendants be ordered to notify all applicants whose cases are

"pending" or have been denied based upon (a) the Shared Household Rule or (b) duplicate

information on the application that the applicant is eligible to establish a separate household in a

different geographic location after the disaster.  Plaintiffs request notification of this by the use

of, at a minimum, public service announcements, television, radio, and newspaper ads.   After

several conferences with the parties and discussion of the matter in open court it appears to the

Court that this is an issue to which, at least conceptually, the parties agree.  The problem appears

to be that the Government needs some time to determine whether it will be able to agree to

plaintiffs notice and dissemination proposals.  FEMA issued a Memorandum dated September

19, 2005 to its Regional Directors and Acting Regional Directors which stated,

> This memorandum serves as official notification to Regions that temporary housing
> assistance for more than one residence may be provided to a household whose members
> are displaced and living in different geographical locations from one another as a result
> of Hurricane Katrina.  Household members in the same geographical location will
> continue to be eligible for assistance in accordance with 44 CFR 206.117(b)(1)(i)(A).
> *See* Rec. Doc. No. 32.

After systematically questioning the parties in several conferences, it appears that FEMA's

position is that if persons were members of the same household, living in the same

boardinghouse, sharing an apartment, or other similar living arrangement, and as a result of

Hurricane Katrina are now residing or occupying different premises, they would each be entitled,

if eligible under all other criteria, to receive Temporary Housing Assistance.   Plaintiffs provided

declarations and testimony at the hearing that persons who were eligible to receive Temporary

Housing Assistance were denied because of a linkage in the NEMIS computer system used by

FEMA to a shared household, usually via similar address and/or telephone contact information.

Plaintiffs also contend that despite FEMA's September 19 memorandum these persons continue

to be denied assistance even though eligible; further many persons are unaware of the above-

referenced memorandum's existence.    Noting that the Memorandum was directed to "Regional

Directors" and "Acting Regional Directors" for Regions I-X and not the general public or

evacuees, the Court agrees that the September 19, 2005 Memorandum is not abundantly clear

and that plaintiffs have demonstrated that sufficient notice has not been given to potential

eligible persons who have not received Assistance or have been denied Assistance as a result of

being incorrectly linked with other persons.  At this juncture the Court has not been made aware

of any mandatory provision which would require such notice under these circumstances, but strongly urges the parties to reach an agreement on these issues.

Plaintiffs have also pled a violation of substantive and procedural due process in relation to the lack of notice regarding the waiver of the shared household rule.  Even assuming plaintiffs have a property interest for the purpose of making a Due Process claim, the Court does not find sufficient harm to warrant the finding of a constitutional violation as to these lack of notice issues at this time.

### 2. Reimbursement of Restricted Rent Assistance Funds

On November 21, 2005 FEMA issued another Memorandum entitled "Disaster Specific Guidance- Hurricanes Katrina and Rita Recertification of Rental Assistance" which purported to allow those who received the initial $2358 rental payment in Temporary Housing Assistance but due to a lack of notice as to its particular restrictions for rent only spent it on necessary sundries and are now requesting further Assistance, to be recertified provided they sign and return an attached self-certification form.  Plaintiffs request greater dissemination of FEMA's waiver of this restriction through methods similar to those described above such that if an applicant used the money on something other than housing rent they are still eligible for continued assistance. It is the Courts understanding   Notably, while the November 21, 2005 Memorandum contains an attached self-certification from that an *evacuee* seeking further assistance must sign and return, the Memorandum itself is addressed only to "Donna Dannels, Acting Deputy Director of Recovery, Chief, National Processing Service Center Station" and *not* to the general public or evacuees at large.  After discussions with the parties it is the Court's understanding that evacuees need not provide rental receipts or re-pay the initial $2358 rental assistance payment in order to

receive additional rental assistance if "they are otherwise eligible and certify, in writing (via the

attached form), that one *or* both of the following situations apply:"

    a.    They received the initial rental assistance prior to receiving official written
        notification through the mail explaining the intended use of the rental assistance;

    b.    They used all or a substantial part of the rental assistance on serious and essential
        needs (e.g. food, clothing), because they lacked sufficient additional funding to
        address those needs.  *See* Rec. Doc. No. 32.

        The Court is cognizant that FEMA has demonstrated flexibility in regards to the shared

household rule and in not seeking reimbursement of the rental assistance funds improperly

expended on essential non-rent items.  In the Court's view this flexibility was absolutely

necessary in light of the hundreds of thousands of persons affected and displaced all over the

country by Hurricanes Katrina and Rita.  However, flexibility without dissemination is

somewhat hollow.  In order for the intent of the modifications to have real effect FEMA should

make every effort to notify each and every applicant or potential applicant of these changes and

their rights, if any, to receive additional assistance.  Many are of the belief that they have no such

right because of improper or insufficient communication.  As of yet, the Court has not been

made aware of any mandatory provision which would require such notice under these

circumstances; however, as above, the Court strongly urges the parties to reach an agreement on

these issues.

        Plaintiffs have pled a violation of substantive and procedural due process in relation to

lack of notice regarding the $2358 rental payment as well.  Even assuming plaintiffs have a

property interest for the purpose of making a Due Process claim, the Court does not find

sufficient harm to warrant the finding of a constitutional violation as to these notice issues at this

time.

### 3. SBA Loan Application Requirement

Section 5174(a)(2) of the Stafford Act provides:

"[A]n individual or household *shall not* be denied assistance under paragraph (1)[Temporary Housing] . . . of subsection c [Types of Housing Assistance] solely on the basis that the individual or household has not applied for or received any loan or other financial assistance from the Small Business Administration or any other Federal Agency." 42 U.S.C.§5174(a)(2)(emphasis added).

Despite this provision, plaintiffs have provided declarations showing that individuals with FEMA have either misinformed or not fully informed applicants for Temporary Housing Assistance is *only* necessary if "Other Needs Assistance" (medical, dental, and the like) is required.  *See* 42 U.S.C. §5174(e).  FEMA has also not made it clear that even if Other Needs Assistance is sought, one may still receive the Temporary Housing Assistance in the meantime or without applying for an SBA loan.

Therefore, pursuant to §5174(a)(2) of the statute, the Court finds that FEMA has violated a mandatory duty through the mis-communication or inartful communication of the protocol for receiving Temporary Housing Assistance by causing some applicants to believe that an SBA loan application is a necessary prerequisite to receiving Temporary Housing Assistance.  Thus the Court will grant plaintiffs' requested relief as to this claim as set forth in the Injunction Order which will be set forth hereinafter in this Order and Reasons.

### 4. Pending Applications

With regard to the 84,470 applications still deemed "pending" almost three months after the storm,[13] the Court is keenly aware of the immediate needs of those applicants.  The Court is

---

[13]*See* Declaration of Michael Hirsch, Individual Assistance Branch Chief, Recovery Division, FEMA (December 5, 2005), para. 54, Rec. Doc. No. 32.

also keenly aware of the admonition of Congress for Courts not to unduly interfere in administrative decisions and procedures.  Plaintiffs have requested that the Court order all pending applicants to be considered presumptively eligible and/or order FEMA to act on these applications on or before January 1, 2006.  The Court notes that the method of proceeding with applications does involve an element of discretion on the part of FEMA; however the Court also notes that under §706(1) of the A.P.A., the Court "shall compel agency action unlawfully withheld or unreasonably delayed."  The Stafford Act and the Regulations pursuant to it are unclear as to when FEMA should be mandated to act on these pending applications.  The Court is aware that this catastrophe has stretched everyone's resources and both Congress and FEMA have made substantial efforts to increase FEMA's resources in particular.  The Court will not issue an order setting forth a timetable at this point; nor will the Court declare all pending applications as presumptively eligible.  However, if requested by plaintiffs, the Court will reexamine the necessity of establishing such a timetable at a later date should FEMA not make extremely substantial progress in processing these pending applications. Moreover, at this time, the Court finds that plaintiffs have not shown that there is a constitutional violation in not processing the applications.  However this issue will remain open to reexamination as well, should eligible applicants continue to be pending for an undue length of time as determined by the Court.

### 5. Short-Term Lodging Program

Section 5151(a) of the Stafford Act provides,

The President *shall* issue, and may alter and amend, such regulations as may be necessary for the guidance of personnel carrying out Federal assistance functions at the site of a major disaster or emergency.  Such regulations *shall include* provisions for insuring that the distribution of supplies, *the processing of applications*, and other relief and assistance

18

activities shall be accomplished in an equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, or economic status.  42 U.S.C. §5151(a).

In accordance with the above mandate, FEMA has promulgated its own "Nondiscrimination in disaster assistance" regulation which echoes the above sentiments.  *See* 44 CFR §206.11(b).  Plaintiffs ask that this Court order relief such that no eligible applicant who has applied for benefits whose application has yet to be processed be evicted[14] from a FEMA subsidized hotel or motel until fifteen (15) days after that disposition, but in no case earlier than February 7, 2006.

FEMA's actions in reference to its subsidy of hotels and motels has been notoriously erratic[15] and numbingly insensitive.  Persons who have lost their jobs, their homes, their cars, all their worldly possessions, and in some cases, family members, have been living in hotel rooms for many months.  At the hearing, named plaintiff Leonora Bartley testified that she is four months pregnant, estranged from her husband, and living in San Antonio, Texas with her 8-year-old son in a FEMA-paid room at a Motel Six. Hers is one of more than at least 37,000

---

[14]FEMA objects to the use of the word "evicted" but under the circumstances, the Court finds use of the word could be considered euphemistic as opposed to "put on the street," "thrown out," or "rendered homeless" and the like.

[15]FEMA has changed the relevant dates for the Short-Term Lodging Program at least three times (from November 30, 2005 to December 15, 2005 to January 7, 2006) and issued at least three internal directives (November 14, 23, and December 9, 2005) since taking over the program for the Red Cross in late October.  These actions have resulted in some evacuees getting Notices to leave their hotels and motels in a haphazard fashion, creating considerable anxiety for those persons most directly affected by FEMA's inconsistencies.  *See* Testimony of Leonora Bartley, Transcript, Dec. 9, 2005 p. 24 ("The first letter stated I had 'till January 7th to stay there, that after that they would no longer pay the hotel.  And then two days later I was sent another letter stating that as of December the 14th I would no longer be there because they weren't going to be paying anymore.").

hotel and motel rooms that FEMA is currently subsidizing.[16]   Bartley was a nursing home rehab

technician before Katrina struck, and as a result of the storm, was displaced first to Gonzales,

Louisiana and eventually ended up in San Antonio because she had no luck finding a place to

live in Gonzales.  When asked by the Government whether living in a temporary apartment

instead of a motel wouldn't be better, Bartley said, "Of course. I'd have a stove. I'd have a

refrigerator. I wouldn't be living out of an ice chest."[17]   Ms. Bartley further testified that despite

her own diligent efforts, including the use of a FEMA provided 1-800 number, she has been

unable to find adequate housing (either public or private) in San Antonio for herself and her

son.[18]  Ms. Bartley's story is only one of thousands very similar stories, and these victims have

been told by FEMA that they would have to their respective hotels or motels on November 30,

2005, then December 15, 2005.  They were then told that *some* would have to leave on

December 15, 2005 whereas others would have until January 7, 2005.  As of December 9, 2005,

the date of the instant hearing, FEMA provided a letter which in essence stated that in the event

an applicant had not received his or her funds by December 15, 2005 the applicant could remain

at their hotel or motel.  *See* Record of December 9, 2005 Hearing, FEMA Exhibit 1.  It is

unimaginable what anxiety and misery these erratic and bizarre vacillations by FEMA have

caused these victims, all of whom, for at least one point in time, had the very real fear of being

without shelter for Christmas.  When Michael Hirsch,  Individual Assistance Branch Chief of

---

[16]As of December 9, 2005, *see* Testimony of Michael Hirsch, Transcript, Dec. 9, 2005 p.
70-71; *see also* Declaration of Michael Hirsch, para. 42, Rec. Doc. No. 32 (stating that the number
of hotel rooms was approximately 41,800 as of December 5, 2005).

[17]*See* Testimony of Leonora Bartley, Transcript, Dec. 9, 2005 p. 32.

[18]*Id.* at 18-33.

FEMA's Recovery Division, was asked as to the rationale for this termination of benefits, he seemed as bewildered as this Court and basically stated he did not know.[19]

It is very evident to the Court that the majority of the persons affected by the January 7, 2006 deadline are the most disadvantaged of our citizens and/or the persons who lost virtually all of their property, economic livelihood, and in some cases, family members as a result of Hurricane Katrina and its aftermath.  Congress, in enacting the Stafford Act clearly mandated that ". . . relief and assistance activities shall be accomplished in an equitable and impartial manner without discrimination on the grounds of . . . economic status."  42 U.S.C. §5151(a). The arbitrary January 7, 2006 termination of benefits is directly aimed at those who have virtually no resources, economic or otherwise.  Nor is this termination equitable or impartial as mandated by the statute.  Many of the persons who already received Temporary Housing Assistance have a place to reside, either in their own home, the homes of friends or relatives, or resources to afford replacement housing.  The plaintiffs and the putative class did not choose to live in hotel rooms and, by definition, no one in the putative class was homeless prior to the hurricane.  Clearly the hurricane did not discriminate based on economics, as the wealthy as well as the poor were substantially affected; however those persons with resources and access have generally found alternate housing and are not living in a hotel or motel or shelter.  Clearly the economic status of those in the hotels is in general far less than those victims not in hotels.

The Government has stated on at least two occasions at the Hearing that citizens have come to think of every problem in the United States as a federal problem and that the federal

---

[19]*See* Testimony of Michael Hirsch, Transcript, Dec. 9, 2005 p. 70-71.

government is responsible for them.[20]  While the Court has no empirical evidence of this statement (or that it is true), certainly in this instance, by *law and mandate*, the federal government *is* responsible.  This refrain by FEMA clearly indicates an insensitivity to their Congressional mandate as stated in the Stafford Act as follows:

§5121. Congressional findings and declaration
(a)     The Congress hereby finds and declares that–
    (1)     because disasters often cause loss of life, human suffering, loss of income, and property loss and damage; and
    (2)     because disasters often disrupt the normal functioning of governments and communities, and adversely affect individuals and families with great severity;
special measures, designed to assist the efforts of the affected States in expediting the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas, are necessary.
(b)     It is the intent of the Congress, by this chapter, to provide an *orderly and continuing means of assistance by the Federal Government* to State and local governments in carrying out their responsibilities *to alleviate the suffering and damage which result from such disasters* . . . 42 U.S.C.§5121.

An act by FEMA and its employees and contractors in direct violation of the Statute and the Regulations promulgated thereby clearly comes under the purview of *Berkovitz* and the A.P.A.  FEMA does not have the discretion to ignore a mandatory directive.  The Court finds that in setting this arbitrary date it has done just that.  Furthermore the Court also finds that these actions by FEMA not only discriminate against victims based on the grounds of economic status and prohibited in the Stafford Act, but also violate the intent of Congress in providing for disaster aid to assure an orderly and continuing means of assistance and alleviate the suffering of those most affected by Hurricane Katrina.  *See* 42 U.S.C.§§4121, 5151(a).

_____

[20] *See* Transcript, Dec. 9, 2005, p. 169 ("We have come to think of every problem in the United States as a federal problem.  We have come to think that the federal government is responsible. . . ").

Although FEMA made some effort to extend the deadline for all persons to January 7, 2006, this does not resolve the underlying economic discrimination.  In the event a victim received their benefits on January 6, 2006, it would be virtually impossible to find housing in one day.  Moreover, according to the testimony of Ms. Bartley, without funds in hand it is impossible to find housing, and even with funds in hand, it will be extraordinarily difficult in some areas.[21]  Of course, FEMA could provide a person with a trailer and that would resolve the issue if it could be done in a timely fashion.  FEMA has admitted that it cannot process all of the pending applications by January 7, 2006, and FEMA has taken the position that a Court cannot order them to do so.  Moreover, underlying FEMA's position is a theme that every person ultimately has to take of him or herself.  Certainly as a general rule this is true; but perhaps that position is unduly callous under the circumstances wrought by Hurricane Katrina.  As stated, as of the date of the Hearing FEMA again modified its position with regards to the termination of the hotel/motel subsidy.  This modification in essence allowed all persons in all states in hotels or motels as of December 9, 2005 to remain in these accommodations until January 7, 2006. Although the Court commends FEMA for modifying its position it is simply not enough.  FEMA cannot assure the Court that it will process all or most of the applications of the persons living in hotels and/or motels by January 7, 2006.  The Court is convinced that many persons in the putative class will be irreparably harmed by FEMA's admitted inability to process the pending applications.  Therefore the Court will order that:

---

[21]*See* Testimony of Leonora Bartley, Transcript, Dec. 9, 2005 p. 25-26.

1. The Short-Term Lodging Program under §403 shall not be terminated as to any person in any state earlier than January 7, 2006 even if that person receives Temporary Housing Assistance under §408 or a denial of their Application prior to that time;

2. The Short-Term Lodging Program under §403 shall terminate no later than February 7, 2006 unless ordered by this Court or if FEMA chooses to extend the deadline established by this Court; and

3. Every person shall have two (2) weeks from the time of receiving a determination of their application for Assistance, namely either (a) approval for *and* receipt of Assistance, or (b) a denial determination, to remain in their present FEMA-subsidized hotel or motel before that person's participation in the Short-Term Lodging program is terminated; however in no event shall any person remain in the program beyond February 7, 2006.  Therefore, as an example, if a person receives either the Assistance itself or a denial of Assistance on February 6, 2006, they must still vacate any hotel or motel room by February 7, 2006.  In the event a person receives Assistance or a denial of Assistance on January 6, 2006, they will have until January 20, 2006 to find alternate accommodation.

The Court is well aware that this remedy is neither a panacea for those in hotels and motels nor for the Government.  The Court is constrained to narrowly tailor this injunction to the extent possible in order to meet the immediate threat of irreparable harm.  Moreover, as the Court stated in open court, any party may seek modification of this Order at any time upon a proper showing.

An additional issue was raised by the Government at oral argument.  The Government contended that if an injunction were issued it should only apply to the named plaintiffs and not the putative class. The Government did not brief this issue nor give the Court any oral citation

for this position.  Such request would render this Temporary Restraining Order virtually

meaningless.  Obviously there has not been sufficient time for the Court to conduct a class

certification hearing.  It is the Court's opinion that plaintiffs will have a substantial likelihood of

success in establishing the requisites for certification of numerosity, typicality, commonality, and

that the class representatives will fairly and adequately protect the interests of the parties.  *See*

Fed.R.Civ.P. 23.  Therefore this injunction shall apply to the putative class.  *See, e.g.*, *Crue v.*

*Aiken*, 137 F.Supp. 2d 1076 (C.D. Ill., 2001); *Rabin v. Wilson-Coker*, 2003 WL 1741883 *1 (D.

Conn., Mar. 31, 2003)(Chatigny, J.).

      Consequently, for the reasons stated above, the Court finds that plaintiffs have satisfied

the elements necessary for the issuance of a Temporary Restraining Order with regards to the

SBA Loan Requirement and the Short-Term Lodging Program.   Plaintiffs' Motions as to these

two issues is hereby **GRANTED**.  Plaintiffs' Motions with respect to the Shared Household

Rule, the Re-certification of Continued Rental Assistance, and a timetable regarding the

processing of "pending" applications, are **DENIED**.  Accordingly,

      **IT IS ORDERED THAT** with regards to 42 U.S.C. §5174(a)(2) (the "SBA Loan

application requirement"issue ) defendants are **HEREBY TEMPORARILY RESTRAINED**

**AND ENJOINED FROM** requiring applicants for Temporary Housing Assistance to complete

an SBA loan application or apply for an SBA loan as a prerequisite to applying for or receiving

temporary housing assistance, or from inquiring into the income of applicants in connection with

processing applications for Temporary Housing Assistance, or from mis-communicating the

nature of §5174 to any Applicant so inquiring.   **IT IS FURTHER ORDERED THAT**

defendants must notify those applicants who, as a result of any past mis-communication, filled

out an unnecessary SBA loan application, or may not have pursued assistance because they were

told that an applicant must apply for a SBA loan in order to obtain temporary housing assistance. Defendants must notify applicants and potential applicants that no such requirement exists and that no applications will be held up for Temporary Housing Assistance processing due to an SBA Loan application not being filled out, or being filled out incorrectly, unnecessarily, and/or superfluously.  Defendants must publicize the rule that only those applications requesting Other Needs Assistance as defined by the Stafford Act and determined by FEMA will be required to fill out an SBA Loan Application, and in no cases will such a Loan Application be required for Temporary Housing Assistance.

**IT IS ALSO ORDERED** that with regards to §403 and §502 of the Stafford Act (42 U.S.C. §§ 5170b and 5192) and the funding of the Short-Term Lodging Program, defendants are **HEREBY TEMPORARILY RESTRAINED AND ENJOINED FROM** terminating the Short-Term Lodging Program as to any person in any state earlier than January 7, 2006 even if that person receives Temporary Housing Assistance under §408 or a denial of their Application prior to that time.  **IT IS FURTHER ORDERED** that the Short-Term Lodging Program shall terminate no later than February 7, 2006 unless ordered by this Court or if FEMA chooses to extend the deadline established by this Court.  **IT IS FURTHER ORDERED** that every evacuee currently participating in the Short-Term Lodging program shall have two (2) weeks from the time of receiving a determination of their application for Assistance, namely either (a) approval for *and* receipt of Assistance, or (b) a denial determination, to remain in their present FEMA-subsidized hotel or motel before their participation in the Short-Term Lodging program is terminated; however in no event shall any person remain in the program beyond February 7, 2006.

Because adequate Notice was given and a full Hearing was conducted with all parties present and participating, this Order shall remain in effect until the Preliminary and Permanent injunction Hearing scheduled for February 23-24, 2006. *See* Fed. R. Civ. Pro. 65.

Signed this 12th day of December, 2005, in New Orleans, Louisiana.

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**